FILED

SEP 0 8 2017

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Facebook and Instagram Records Relating to Specificed
User Accounts, Stored at Premises Controlled by
Facebook, Inc.

)
)
)
)
)
)

Case No. 4:17 mj 1159 - JG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the **Northern** District of **California**, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g), 924(c) | Firearm by Felon; Possession of Firearm in Furtherance of Drug Trafficking Crime |
| 21 U.S.C. § 846 | Conspiracy to Distrib. and Poss. with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Michael Horn, ATF
*Printed name and title*

On this day, MICHAEL HORN
appeared before me via reliable electronic means, was
placed under oath, and attested to the contents of this
Application for a Search Warrant.

_____
*Judge's signature*

City and state: Raleigh, North Carolina

Hon. James E. Gates, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF FACEBOOK AND INSTAGRAM RECORDS RELATING TO SPECIFIED USER ACCOUNTS, STORED AT PREMISES CONTROLLED BY FACEBOOK, INC.** | Case No. <br><br> Filed Under Seal |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Horn, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain specified Facebook user ID and Instagram accounts that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID and accounts described in Attachment A (the "Subject Accounts").



2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives and have been since 2012. Prior to my assignment as a Special Agent with ATF, I was an ATF Task Force Officer while employed as a Detective with the Miami Gardens Police Department. I was employed with that department for five years and was also employed as a police officer with the Lauderhill Police Department for four years. I transferred from the Miami Field Division to the Charlotte Division, Wilmington Field Office on July 9, 2017. During my tenure as a Special Agent and Task Force Officer, I have participated in several federal investigations related to violations of the Controlled Substances Act and federal firearm laws. I have also been involved in the investigation of several criminal gangs. These investigations have included search warrants, physical and electronic surveillance, and arrests of several firearms violators, narcotics traffickers and gang members. I am thus a "federal law enforcement officer" as defined by Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. The information set forth in this affidavit was obtained during the course of my employment with the ATF, personal observations, through the statement of witnesses, information supplied by other local and

Federal law enforcement officers, and through other investigative activity.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841, distribution and possession with the intent to distribute heroin; 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute heroin; 18 U.S.C. § 924(c), possession of a firearm in furtherance of a drug trafficking crime; 18 U.S.C. § 922(g), possession of a firearm by a felon; and 18 U.S.C. §§ 1956(a)(1), 1956(h), and 1957, conspiracy to launder monetary instruments and laundering of monetary instruments, may have been committed by Mario Correllus BARGNEARE, Willie Frank James AHERN, Roy James NOLON, Calvin WILSON, Dwayne Lee STALLINGS, and Corey Javaughn HOWARD. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## BACKGROUND REGARDING FACEBOOK AND INSTAGRAM

5.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.   Facebook permits users to establish individual accounts with Facebook, which can then be used to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

6. Facebook requires users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

7. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

8. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to

4



particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

9. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

10. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged

5

in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

11. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

12. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

13. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or

6

content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

14. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

15. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

16. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

17. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

7

18.   Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

19.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.   When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

20.   Some Facebook pages are affiliated with groups of users, rather than one individual user.   Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.   Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.   Facebook also assigns a group identification number to each group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

21.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status

8

updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

22. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

23. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or

complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

25. Facebook also owns and operates a free-access social networking website named "Instagram" that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

26. Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add a caption to the photo, can add various "tags" to the photo that can be used to search for the photo (e.g.,

a user may add the tag #vw to a photo so that people interested in Volkswagen vehicles can search for and find the photo), can add location information to the photo, and can add other information to the photo, as well as apply a variety of "filters" or other visual effects that can be used to modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

27. Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram. Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profiles. This information may include the user's full name, e-mail addresses, and phone numbers, as well as other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. This information is collected and maintained by Instagram.

28. Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party

11

social media websites and information, or searches conducted by the user on Instagram profiles. This information is collected and maintained by Instagram. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block them, which prevents the blocked user from following that user.

29. Instagram allows users to post and share various types of user content, including photos, comments, and other materials. User content that is posted to Instagram or shared through Instagram is collected and maintained by Instagram. Users on Instagram may also search Instagram for other users or particular types of photos or other content.

30. For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any refining/exit web pages and associated URLs, pages viewed, dates and times of access, and other information. Instagram also collects and maintains "cookies," which are small text files that are placed on a user's computer or mobile device and that allows Instagram to identify the browser or device's

12

accesses to the service. Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

31. Instagram also collects metadata associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

32. Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

33. Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the user accounts identified in this affidavit, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## PROBABLE CAUSE

34.   In May 2015, ATF began working with the New Bern, North Carolina Police Department to investigate a series of gang-related shootings and homicides that began at the end of 2014. During the course of the investigation it was learned that the United Blood Nation, namely a Nine (9) Trey set, was involved in bringing multi-kilogram quantities of heroin into the Eastern District of North Carolina from the Queens area of New York City.   ATF agents were able to identify an organized criminal enterprise operating within New Bern, North Carolina for almost a decade. During interviews, it was learned that this DTO has been involved in the trafficking of heroin, cocaine, and marijuana dating back as far as 2010, and is led by Calvin WILSON.   Members of this DTO are involved in a variety of criminal activities. Some members are involved in the purchasing and transporting of multi-kilogram shipments of narcotics. Other members are involved in the distribution of narcotics on a regional level. Still other members are involved in the local distribution of narcotics. Some members are known to carry firearms and have been implicated in numerous shootings and/or murders. This DTO supplies a number of narcotics users, many of whom are known to be responsible for breaking and entering violations, during which firearms have been stolen.   The narcotics users then capitalize on their connection to this organization to sell/trade firearms for narcotics.   Over the course of this

14

investigation, several stolen firearms have been recovered and subsequently linked to shooting incidents being investigated by police.

35. During the course of this investigation agents have conducted numerous interviews with people familiar with the DTO. Through these interviews, and other investigative techniques, agents have identified sources of supply used by the DTO as multi-kilogram level drug traffickers based in Queens, New York. Agents have also learned the organization is responsible for distributing significant amounts of cocaine and heroin in Jacksonville, North Carolina, Pamlico County, North Carolina, and other locations in the Eastern District of North Carolina. Additionally, agents have identified several subjects WILSON uses to sell drugs for him as well as subjects supplied with drugs by WILSON. For example, informants have provided information that Dwayne STALLINGS sells heroin in association with WILSON.

36. During the course of the investigation, agents have conducted numerous controlled purchases of heroin from members of the DTO, including Mario Correllus BARGNEARE, Willie Frank James AHERN, Roy James NOLON, and Corey Javaughn HOWARD. In many of those controlled purchases from BARGNEARE, BARGNEARE is seen leaving from and returning to a residence in which WILSON lives in New Bern, North Carolina.

37.    The organization consists of several affiliated groups whose names include: "9 Trey Bloods" "Humble Gang", and "scale gang".    Based on my investigation, including review of subject tattoos and social media activity, I have learned that a signature trait of the organization is that its numerous members and associates claim affiliation with "The Bloods" national criminal network. According to the Department of Justice's Organized Crime and Gang Section "[t]he Bloods are a national association of structured and unstructured gangs that have adopted a single gang culture."    See https://dojnet.doj.gov/criminal/ocgs/gangs/street-gangs.html.    Further, associates of the organization have been implicated as participants in multiple assaults, firearm offenses, armed robberies, shootings and murders.

38.    I know from my training and experience that Blood gang members communicate through Facebook with other members throughout the United States. Gang members, and members of the Bloods in particular, often post indicia of membership and association with the gang on their Facebook and Instagram accounts, including, but not limited to, photographs of clothing bearing gang insignias or containing gang colors; photographs of members posing together; photographs showing gang-specific "hand signs;" and photographs depicting themselves or other Bloods members displaying Bloods related tattoos. Bloods members also post photographs of gang symbols, weapons, narcotics and gang graffiti on their accounts.

16

As described below, the subscribers or customers associated with the user IDs described in Attachment A utilize Facebook and Instagram to communicate with one another and to post messages and photographs that evidence their membership in and support of the DTO.

39. On July 26, 2017, the Honorable James C. Dever III, Chief United States District Judge, Eastern District of North Carolina, issued an Order authorizing a Title III wiretap for the interception of wire and electronic communications over a telephone known to be used by BARGNEARE. See 4:17-MJ-1124-D. On August 17, 2017, Chief Judge Dever issued an Order authorizing the continued interception of wire and electronic communications from BARGNEARE's telephone and authorizing the interception of wire communications over a telephone known to the used by WILSON. See id.

40. Investigators have intercepted communications over these wiretaps that further establish that WILSON is operating the DTO in order to sell heroin in the Eastern District of North Carolina and elsewhere, and that he utilizes numerous individuals to sell heroin on his behalf, namely, BARGNEARE and NOLON. In addition, surveillance conducted in connection with the wiretaps has established that both AHERN and HOWARD interact routinely with WILSON and are likely being supplied by WILSON's New York source of supply.

41.    On August 2, 2017, investigators observed activity that they believe was associated with a re-supply of heroin to the DTO. First, investigators watched video surveillance of the residence of WILSON. Investigators observed AHERN arrive, enter the home for a short period of time, then exit the residence. Later on in the day investigators obtained surveillance on WILSON and BARGNEARE while driving to Jacksonville, NC. BARGNEARE, WILSON and an Unknown Male (UM) entered a Chili's restaurant and met with HOWARD. HOWARD sat a separate table while WILSON, BARGENARE, and the UM sat and ate food. During the course of the hour, HOWARD entered the bathroom, then WILSON entered the restroom very shortly after. WILSON, BARGNEARE, and UM then exited the restaurant, and HOWARD entered the restroom again. Based on training and experience, I know that narcotics traffickers will conduct a "drop" exchange money for narcotics at a public location like the Chili's to avoid law enforcement detection.

42.    Between January 2017 and the present, investigators conducted several independent internet social media queries into public sites such as Facebook.com and Instagram.  Through these searches, I located several accounts associated with members and associates of the DTO displaying illegal narcotics and firearms, along with demonstrating associational gang hand signs and wearing of the Blood gang colors (red/black).

43.  A preservation request was made to Facebook on April 3, 2017 in order to preserve all records related to the Facebook and Instagram accounts connected to the following individuals:

a. Mario BARGNEARE

    i.  Facebook: "Reo.degeniero"

       https://www.facebook.com/reo.degeniero?ref=br_tf

       User ID: 100001259797768

    ii.  Instagram: @DEGENIERO5

b. Willie AHERN

    i.  Instagram: @WIILEDYNOMITE

c. Roy NOLON

    i.  Facebook: "Roy Nolon (Ballhard)"

       https://www.facebook.com/roy.nolon

       User ID: 100003849778622

    ii.  Instagram: @ r_o_ystone

d. Calvin WILSON

    i.  Instagram: respecttheshooterfirst

e. Dwayne STALLINGS

    i.  Facebook: Dwayne.Stallings

       https://www.facebook.com/dwayne.stallings

       User ID: 100000927141532

f. Corey HOWARD

    i.  Facebook: Codak Howard

       https://www.facebook.com/codak.howard

19



User ID: 100001874026462

**Mario Correllus BARGNEARE**

44. As described above, agents have been investigating
BARGNEARE since at least late 2016 in connection with his dealing
heroin on behalf of the WILSON DTO. As a part of that
investigation, agents have conducted numerous controlled purchases
of heroin, totaling more than 100 grams of heroin. In addition,
agents have been intercepting communications over the Title III
wiretap of BARGNEARE's telephone from July 27, 2017 to the present,
which confirm that BARGNEARE sells heroin, utilizes and
distributes firearms, and transports money on behalf of the DTO
nearly every day.

45. Through open source searches, law enforcement identified
a Facebook account operated by BARGNEARE. The user name and ID
associated with the account are "Reo.degeniero" and
100001259797768. I know that BARGNEARE often goes by the street
name "Rio" (short for Mario), and that "Reo.degeniero" likely is
a call back to the city of Rio de Janeiro in Brazil. BARGNEARE's
Facebook page contains multiple photographs of him displaying gang
signs related to the Bloods street gang. Throughout BARGNEARES's
Facebook account there are several photos of BARGNEARE wearing
black and red clothing, which is the national color for the Bloods
street gang. He is Facebook friends with several co-conspirators
and Blood street gang members, including Lashawnna MCCOTTER,

20

Dwayne STALLINGS, Justin WIGGINS, and Taurean LECRAFT. MCOTTER and WIGGINS have been intercepted on the Title III wiretap discussing the DTO and/or its illegal activities. Furthermore, on September 5, 2017, a call was intercepted from WIGGINS to WILSON in which WIGGINS discussed that he was still waiting for "that Facebook shit."

46. The most recent post by BARGNEARE was from July 16, 2017, in which he stated "ITS WORSE NOW BUT EVERYTHING STILL RED AND 💯 👌". The statement advises everything is still "RED", which refers to the Blood color of red. I know through my training and experience that the emoticon 💯 is a commonly used symbol in the Bloods to mean legitimate, gangster, and loyalty. I also know that the emoticon 👌 is commonly used to symbolize a hand signal for a letter "B" for "Bloods."

47. Through open source searches, law enforcement identified an Instagram account operated by BARGNEARE. The user name associated with the account is "@DEGENIERO5," and it also contains several photographs with BARGNEARE wearing high-end expensive jewelry believed to be purchased from proceeds from illegal narcotics sales. The investigation has uncovered no legitimate source of income for BARGNEARE. BARGNEARE also displays several photographs of him wearing red and black clothing and flashing gang hand symbols all related to the Bloods street gang. The most

recent photo depicting the Blood street gang with jewelry is posted to BARGNEARE's Instagram account on April 23, 2017, with the caption "BLESSED UP" and the Blood street gang emoticon .

### Calvin WILSON

48. As described above, agents have been investigating WILSON since at least May 2015 in connection with his operation of the DTO. As a part of that investigation, agents have conducted numerous controlled purchases of heroin from individuals selling on WILSON's behalf, including BARGNEARE and NOLON. In addition, agents have been intercepting communications over the Title III wiretap of BARGNEARE and WILSON's telephones from July 27, 2017 to the present, which confirm that WILSON manages the operations of the DTO, ordering BARGNEARE to come to WILSON's house in order to sell heroin and distributing heroin to NOLON directly.

49. Through open source searches, law enforcement identified an Instagram account operated by WILSON. The user name associated with the account is "@RESPECTTHESHOOTERFIRST," and it contains several photographs with him wearing high-end expensive jewelry believed to be purchased from proceeds from illegal narcotics sales. WILSON displays several photographs of him wearing red and black clothing and flashing gang hand symbols all related to the Bloods street gang. WILSON appears in several photographs in the company of members of the conspiracy and other Blood street gang



members, including Taurean LECRAFT, STALLINGS, AHERN, and Ontario
WEBB. WEBB has been intercepted on the Title III wiretap discussing
the DTO and/or its illegal activities. The most recent Instagram
post I have found is from February 26, 2017, which was posted by
WILSON linking AHERN'S account in the photo with the blood gang
sign emoticon 👌 . In the photograph WILSON can be seen displaying
a Blood street gang hand sign.

### Willie Frank James AHERN

50. Investigators with the Pamlico County Sheriff's Office
and New Bern Police Department have been investigating AHERN's
role within the DTO for some time. In connection with that
investigation, agents have conducted several controlled purchases
of heroin from AHERN and have executed a search warrant on his
residence in which they located Us currency in the amount of
$14,075, two empty wrappers which previously contained two
kilograms of cocaine, a small amount of marijuana, blood gang
literature.

51. Most recently, on July 31, 2017, investigators with the
Pamlico County Sheriff's Office conducted a controlled purchase of
a quantity of heroin from AHERN. Investigators were conducting
surveillance during this controlled purchase of heroin and were
able to observe AHERN arrive. The encounter was captured on a
digital audio and video recorder worn by the confidential source,

and investigators were able to positively identify AHERN from the video. The suspected heroin field tested positive for the presence of heroin.

52. Through open source searches, law enforcement identified an Instagram account operated by AHERN. The user name associated with the account is "@WIILEDYNOMITE," and it contains several photographs with AHERN wearing high-end expensive jewelry believed to be purchased from proceeds from illegal narcotics sales. AHERN displays several photographs of him wearing red and black clothing and flashing gang hand symbols all related to the Bloods street gang. AHERN also appears in several photographs in the company of members of the conspiracy and other Blood street gang members, including STALLINGS, Taurean LECRAFT, Ontario WEBB, and Damien STALLINGS. WEBB has been intercepted on the Title III wiretap discussing the DTO and/or its illegal activities.

53. Due to privacy settings on AHERN's Instagram page, investigators are unable to see recent posts. However, investigators are able to see the above-described photos through other co-conspirators Instagram pages with AHERN's account linked. The most recent post I have found was from February 26, 2017, which was posted by WILSON, linking AHERN'S account in the photo with the Blood gang sign emoticon.

## Roy James NOLON

54. NOLON is an identified member of the WILSON DTO that agents have been investigating since approximately October 2013. In connection with that investigation, agents have conducted three controlled purchases of quantity amounts of heroin from NOLON on October 3, 2016, October 5, 2017 and November 28,2017. Investigators were able to positively identify NOLON from the video recordings of the controlled purchases.

55. In addition, NOLON has been intercepted on the Title III wiretaps ordering quantity amounts of heroin from WILSON directly. For example, on August 23, 2017, NOLON called WILSON and stated "I need two of them." Investigators know that when NOLON orders "two of them" he is speaking of 2 gram of heroin.

56. Through open source searches, law enforcement identified a Facebook account operated by NOLON. The user name and ID associated with the account are "roy.nolon" and 100003849778622. The Facebook page contains several photographs showing NOLON holding US Currency, firearms, and narcotics. It also contains several photographs with him wearing high-end expensive jewelry believed to be purchased from proceeds from illegal narcotics sales. Investigators have been unable to uncover any legitimate source of income for NOLON. NOLON displays several photographs of himself wearing red and black clothing and flashing gang hand symbols all related to the Bloods street gang. Furthermore, NOLON

25



appears in several photographs in the company of members of the conspiracy and other Blood street gang members, including WILSON, Rodney PENDER, and Alshon STILLEY.

57. Through open source searches, law enforcement identified an Instagram account operated by NOLON. The user name associated with the account is @R_O_YSTONE, and it contains several photographs with him wearing high-end expensive jewelry believed to be purchased from proceeds from illegal narcotics sales. NOLON displays several photographs of him wearing red and black clothing and flashing gang hand symbols all related to the Bloods street gang. In addition, NOLON appears in several photographs in the company of members of the conspiracy and other Blood street gang members, including Rodney PENDER, WILSON, and Alshon STILLEY. NOLON frequently has photographs of a tattoo he has on his forearm, which states "humble"/"NLMB", which refers to the Humble Gang subset of the Blood street gang and the common phrase "never leave my brother." NOLON continuously posts pictures and videos of himself and others portraying the Blood street gangs signs and colors, with the most recent being August 25, 2017.

### Dwayne Lee STALLINGS

58. On September 15, 2015 and July 10, 2017, Detective Dombrowsky conducted an interview of a confidential source associated with several members of the DTO. The source stated that Damian BROWN was one of the major suppliers of heroin into New

26

Bern and that STALLINGS and HOWARD were two of his top men for distribution. The source also stated that "Bali" (Calvin WILSON), HOWARD, "Smiley" (STALLINGS), and Damian BROWN were always present at every delivery to whichever house they used. The source described the heroin shipment consisting of 5 "bundles" containing 12 bags per bundle. The source advised that STALLINSG has several people that distribute heroin for him, including Ontario WEBB, aka "Fat Boy," Brian WEBB, and Dante WEBB.

59. Furthermore, agents have intercepted telephone calls between STALLINGS and WILSON over the Title III wiretap. On September 1, 2017, at 1803 hours, investigators intercepted STALLINGS contacting WILSON. STALLINGS asked WILSON if WILSON wanted STALLINGS to hold on to "it", to which WILSON stated that he was out of town and would contact him when he returns. Investigators believe that "it" is a cache of narcotics, specifically heroin, based on debriefs of confidential informant(s). Investigators intercepted a second call from STALLINGS to WILSON on September 4, 2017, at 1703 hours. STALLINGS asked WILSON if he was home, to which WILSON stated he was. STALLINGS asked if WILSON wanted him to come thru with "it". Again, investigators believe that STALLINGS was holding either narcotics or currency for WILSON and was attempting to meet with him to transfer it to WILSON. Investigators intercepted an additional call from STALLINGS to WILSON on September 4, 2017. STALLINGS

advised WILSON that there may be a police round-up the next week and to be safe. STALLINGS continued to say that he was going to clean out all of his stuff. Investigators believe this call was to warn WILSON about the police and to hide his illegal activity as well so that WILSON did not get arrested. Investigators also believe that STALLINGS was speaking about cleaning his "stuff out," meaning moving his narcotics from its current location to another in case the police came to search.

60. Through open source searches, law enforcement identified a Facebook account operated by STALLINGS. The user name and ID associated with the account are "Dwayne.Stallings" and 100000927141532. The Facebook page contains several photographs with STALLINGS wearing high-end expensive jewelry believed to be purchased from proceeds from illegal narcotics sales. Investigators have not been able to uncover a legitimate source of income for STALLINGS. STALLINGS displays several photographs of him wearing red and black clothing and flashing gang hand symbols all related to the Bloods street gang. In addition, STALLINGS appears in several photographs in the company of members of the conspiracy and other Blood street gang members, including Ontario WEBB, Calvin WILSON, Taurean LECRAFT, and Josiah KNOX. WEBB, WILSON, and KNOX have been intercepted on the Title III wiretap discussing the DTO and/or its illegal activities. STALLINGS has

posted or has been linked to such photos, with the most recent from June 26, 2017.

### Corey Javaughn HOWARD

61.  As discussed above, on September 15, 2015 and July 10, 2017, Detective Dombrowsky conducted an interview of a confidential source associated with several members of the DTO. The source stated that Damian BROWN was one of the major suppliers of heroin into New Bern and that STALLINGS and HOWARD were two of his top men for distribution. The source also stated that "Bali" (Calvin WILSON), HOWARD, "Smiley" (STALLINGS), and Damian BROWN used always present at every delivery to whichever house they lived. This information is relevant and consistent with the meeting at Chili's surveilled by investigators on August 2, 2017.

62.  Through open source searches, law enforcement identified a Facebook account operated by HOWARD. The user name and ID associated with the account are "Codak.Howard" and 10000187402646. I know that "Codak" or "Kodak" are nicknames utilized by HOWARD. HOWARD's Facebook page contains photos of him wearing black and red clothing and with others flashing gang signs, all related to the Blood street gang. HOWARD displays several photos with luxury vehicles and high-end jewelry believed to be purchased from proceeds from illegal narcotics sales. Investigators have not been able to uncover a legitimate source of income for HOWARD. HOWARD has posted several photos of himself on Facebook in the past

29

related to the Blood street gang, and he is linked or attached to other photos with members of the gang and/or co-conspirators, including STALLINGS.

63. Due to privacy restrictions, investigators are unable to observe HOWARD'S account to find current photos. Investigators can observe that HOWARD is Facebook friends with Ontario WEBB, Justin WIGGINS, Josiah KNOX, and STALLINGS, all of whom are co-conspirators. WEBB, WIGGINS, and KNOX have all been intercepted on the Title III wiretap discussing the DTO and/or its illegal activities.

64. Based on the foregoing, I believe that the Facebook and Instagram accounts of the above-listed individuals are likely to have further evidence of their involvement in illegal drug trafficking, firearm possession and distribution, and money laundering.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

65. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to

locate the items described in Section II of Attachment B. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service or execution of the attached search warrant.

## AUTHORIZATION REQUEST

66. Based on the forgoing, I request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

67. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711 and 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of North Carolina is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

68. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the user of the Facebook account would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an

31

opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

69. Because the warrant will be served on Facebook which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

70.  I also respectfully request that this Affidavit be filed under seal. This investigation is currently ongoing and the details in this Affidavit, if disclosed prior to the completion of the investigation, could compromise future undercover operations and alert the subjects, both known and unknown, to the existence of the investigation.


Respectfully submitted,


MICHAEL HORN
Special Agent, ATF


On this __8__ day of _September_ 2017, Special Agent Michael Horn appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Affidavit.


JAMES E. GATES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NORTH CAROLINA



## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook and Instagram user accounts, which are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California:

a. Mario BARGNEARE
   i. Facebook: "Reo.degeniero"
      https://www.facebook.com/reo.degeniero?ref=br_tf
      User ID:100001259797768
   ii. Instagram: @DEGENIERO5

b. Willie AHERN
   i. Instagram: @WIILEDYNOMITE

c. Roy NOLON
   i. Facebook: "Roy Nolon (Ballhard)"
      https://www.facebook.com/roy.nolon
      User ID: 100003849778622
   ii. Instagram: @ r_o_ystone

d. Calvin WILSON
   i. Instagram: respecttheshooterfirst

e. Dwayne STALLINGS
   i. Facebook: Dwayne.Stallings
      https://www.facebook.com/dwayne.stallings
      User ID: 100000927141532

f. Corey HOWARD
   i. Facebook: Codak Howard
      https://www.facebook.com/codak.howard
      User ID: 100001874026462



## ATTACHMENT B

### Particular Things to be Seized

## I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user account listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)    All activity logs for the accounts and all other documents showing the users' posts and other Facebook activities;

(c)    All photos and videos uploaded by those user accounts and all photos and videos uploaded by any user that have that user tagged in them;

2

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the users, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the accounts' usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the users have "liked";

(i) All information about the Facebook pages that the accounts are or were a "fan" of;

(j) All past and present lists of friends created by the accounts;

(k) All records of Facebook searches performed by the accounts;

(l) All information about the users' access and use of Facebook Marketplace;

3



(m)　The types of service utilized by the users;

(n)　The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)　All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)　All records pertaining to communications between Facebook and any person regarding the users or the users' Facebook accounts, including contacts with support services and records of actions taken.

It is further requested that Facebook furnish the information listed above in the following digital file formats: Microsoft Word (".doc"), Microsoft Excel (".xls"), and Portable Document Format (.pdf").


**II.　Information to be searched for and seized by the government**

This warrant authorizes (i) the search by the Government of the property identified in Attachment A only for only the following, and (ii) authorizes the seizure by the Government of the items listed below only to the extent that they constitute evidence of the subject violations; any item constituting contraband due to the subject violations; fruits or instrumentalities of the subject violations; any property designed for use, intended for use, or used in committing the subject violations; or any other item whose possession is illegal due to the subject violations. Specifically,

4

the information sought relates to violations of 21 U.S.C. §§ 841 and 846; 18 U.S.C. §§ 922(g) and 924(c); and 18 U.S.C. §§ 1956(a)(1), 1956(h), and 1957, those violations involving Mario Correllus BARGNEARE, Willie Frank James AHERN, Roy James NOLON, Calvin WILSON, Dwayne Lee STALLINGS, and Corey Javaughn HOWARD, and occurring on or after May 1, 2015, including, for each user account identified on Attachment A, information pertaining to the following matters:

(a) Communications, including but not limited to wall posts, tags, comments, and private messages, discussing (1) drug trafficking or traveling between North Carolina, New York, and/or other States for the distribution and delivery of illegal drugs, (2) the possession or use of firearms in furtherance of drug trafficking, (3) the possession by or distribution to felons of firearms, and (4) purchasing items using proceeds of drug trafficking and/or other evidence of laundering drug proceeds;

(b) Images, photographs, and/or videos related to drug trafficking, the possession or distribution of firearms, and/or laundering drug proceeds;

(c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owners;

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e)   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(f)   The identity of the person(s) who communicated with the user ID about matters relating to drug trafficking, firearm possession and/or distribution, and/or money laundering, including records that help reveal their whereabouts.

## III. 18 U.S.C. § 3103a(b)(2)

Notwithstanding any other provision of this warrant, it prohibits the seizure of the following, pursuant to 18 U.S.C. § 3108a(b)(2): any tangible property; and any wire or electronic communication as defined in 18 U.S.C. § 2510.

This warrant authorizes the seizure of stored wire and electronic information because such seizure is reasonably necessary pursuant to 18 U.S.C. § 3103a(b)(2).

6